OPINION
{¶ 1} In 2007, the Ohio State Medical Board ("board"), ordered a six-month suspension of Dr. Alan J. Parks' license to practice medicine for his alleged failure to conform to minimal standards of care concerning the treatment of three patients between 1995 and 2001. The chief witness against Dr. Parks in the administrative hearings was Dwight A. Scarborough, M.D., with whom Dr. Parks had previously worked while still a resident, and a physician who competes, to some extent, for the same patients with Dr. *Page 2 
Parks. The medical board found, based largely on the testimony of Dr. Scarborough, that Dr. Parks failed to conform to the minimum standards of care. Dr. Parks appealed the medical board's decision to the Franklin County Court of Common Pleas, which upheld the order on December 28, 2007. Our review of the common pleas court's decision is limited to whether the court abused its discretion in finding that the medical board's order was supported by reliable, substantial, and probative evidence. Our review is limited, and does not permit us to independently re-weigh the record. Based on our limited review, we affirm the decision of the trial court.
 {¶ 2} Dr. Parks assigns five errors for our review:
 [I.] THE TRIAL COURT'S DECISION IS IN ERROR BECAUSE THE BOARD'S ORDER IS CONTRARY TO LAW AS TO THE FINDING THAT DR. PARKS FAILED TO OBTAIN INFORMED CONSENT AS TO ALTERNATIVE TREATMENT OPTIONS FOR PATIENT 1.
 [II] THE TRIAL COURT ERRED IN AFFIRMING THE BOARD'S ORDER DESPITE BOARD'S BASIS OF ACTION BEING ON NEW ISSUES NOT RAISED IN ACCORDANCE WITH R.C. 119.
 [III.]THE TRIAL COURT'S DECISION IS IN ERROR BECAUSE THE BOARD'S ORDER IS CONTRARY TO LAW AND NOT SUPPORTED BY SUBSTANTIAL, RELIABLE, AND PROBATIVE EVIDENCE AS IT WAS BASED UPON EXPERT TESTIMONY FROM AN EXPERT WITH AN UNAVOIDABLE AND PREJUDICIAL CONFLICT OF INTEREST.
 [IV.]THE TRIAL COURT'S DECISION IS IN ERROR BECAUSE THE BOARD'S ORDER IS CONTRARY TO LAW AND NOT SUPPORTED BY SUBSTANTIAL, RELIABLE, AND PROBATIVE EVIDENCE AS THE BOARD'S FINDINGS AT 1a AND 1c ARE UNSUPPORTED AS TO PATIENT 1.
 [V.]THE TRIAL COURT'S DECISION IS IN ERROR BECAUSE THE BOARD'S ORDER IS CONTRARY TO LAW *Page 3 
AS THE BOARD'S FINDINGS ARE UNSUPPORTED AND EXCEEDED THE SCOPE OF THE CHARGE OF THE CITE LETTER AS TO PATIENT 3.
 {¶ 3} The Ohio Revised Code vests the medical board with broad authority to regulate the medical profession in this state, and to discipline any physician whose care constitutes: "A departure from, or the failure to conform to, minimal standards of care of similar practitioners under the same or similar circumstances, whether or not actual injury to a patient is established[.]" R.C. 4731.22(B)(6).
 {¶ 4} The common pleas court is the reviewing tribunal for appeals from administrative agencies, such as the medical board, and the standard of review is provided by R.C. 119.12. That statute provides that the trial court may affirm the agency's order if, after considering the entire record, the court finds that the order is supported by reliable, probative, and substantial evidence, and is in accordance with law. R.C. 119.12; Pons v. Ohio State Med. Bd. (1993), 66 Ohio St.3d 619,621, 614 N.E.2d 748. On appeal, courts must defer to the medical board's interpretation of the technical and ethical requirements of that profession. Id. at syllabus.
 {¶ 5} Our review is even more limited than that of the trial court, because it is the trial court's function to examine the evidence. Id. at 621. The court of appeals' function is solely to determine whether the trial court abused its discretion — "not merely an error of judgment, but perversity of will, passion, prejudice, partiality, or moral delinquency." Id. Furthermore, neither we, nor the trial court may substitute our judgment for that of the medical board. See id. (citingLorain City Sch. Dist. Bd. of Edn. v. State Employment RelationsBd. [1988], 40 Ohio St.3d 257, 260-261, 533 N.E.2d 264). *Page 4 
 {¶ 6} To understand the nature of Dr. Parks' assignments of error, we must first summarize the facts and medical history of three former patients. These facts come directly from the medical board's Report and Recommendation ("board report"), prepared by R. Gregory Porter, Esq., a medical board hearing examiner. The hearing examiner heard all the evidence in this matter, including expert testimony, fact testimony from the patients themselves, and testimony from subsequent treating physicians. The hearing examiner also considered scholarly articles, publications, and other documents pertinent to the relevant standards of care. After considering all of this evidence, the hearing examiner issued a 51-page board report. The record on appeal also contains the transcript of the proceedings before the medical board ("transcript"). To protect patient confidentiality, their identities were redacted from the hearing transcripts, and identified by the board as Patients 1-3. We will refer to them in the same manner.
 {¶ 7} Dr. Parks performed three outpatient liposuction procedures on Patient 1, a female, in December 1995, and in April and May 1996. The primary focus of these procedures was Patient 1's neck, but Dr. Parks also performed liposuction on her abdomen, thighs, and hips.
 {¶ 8} Patient 1 was apparently dissatisfied with Dr. Parks' treatment, because she sued him for malpractice in 1997. The lawsuit was terminated after the trial court granted summary judgment in favor of Dr. Parks.
 {¶ 9} The medical board took issue with two aspects of Dr. Parks' care concerning Patient 1: (1) Dr. Parks allegedly failed to discuss and document possible alternative treatments with Patient 1; and (2) Dr. Parks neglected to record Patient 1's bodyweight before the first liposuction procedure, which may have resulted in Patient 1 *Page 5 
receiving an excessive dose of the anesthetic drug lidocaine. The former is the subject of the first assignment of error herein.
 {¶ 10} Patient 1 was approximately 55 years old when she first came to see Dr. Parks. In the months leading up to her first liposuction procedure on her neck and chin, Patient 1 lost about 40 pounds, and was concerned about sagging, loose skin. Dr. Parks testified that he counseled Patient 1 about possibly performing a face-lift or neck-lift to correct the problem, but that Patient 1 opted for liposuction instead, because it was less expensive, and involved a much quicker recovery period. Patient 1 testified that Dr. Parks did not discuss these alternative treatment options with her; however, the medical board hearing examiner determined that Patient 1's testimony was unreliable based on her poor memory.
 {¶ 11} Nonetheless, the medical board hearing examiner determined that Dr. Parks failed to recognize the basic problem regarding Patient 1, and, in doing so, neglected to recommend appropriate alternative treatment options, causing Patient 1 to undergo inappropriate surgery on three separate occasions.
 {¶ 12} Dr. Parks follows what is known in the medical field as the Klein-formula for tumescent liposuction, which is named after Jeffery A. Klein, M.D., regarded as a pioneer of this cosmetic procedure. See, generally, Jeffery A. Klein, Tumescent Technique for Regional Anesthesia Permits Lidocaine Doses of 35 mg/kg for Liposuction, J. Dermatol. Surg. Oncol. 16:3 (1990); (Board Report, at 11-13.) Dr. Klein's formula revolutionized the liposuction procedure by using a local anesthetic — injecting the numbing agent lidocaine directly into the area — rather than using a general anesthetic, which was commonplace in the 1980s, and which resulted in a number of patient deaths. The key to Klein's formula *Page 6 
is the dosage of lidocaine: too little lidocaine would result in unbearable pain to the patient, and too much lidocaine is toxic. This is relevant to Dr. Parks' care of Patient 1 because the medical board determined that Dr. Parks gave her an incorrect dosage of lidocaine.
 {¶ 13} According to Patient 1's medical records, Dr. Parks administered 5,000 milligrams of lidocaine to her during the second liposuction procedure, but he did not record Patient 1's body weight at that time. At other times, Dr. Parks documented Patient 1's weight as high as 182 pounds, but stated that she had since lost weight (about 40 pounds). Dr. Scarborough testified that, assuming Patient 1 weighed 182 (which, in all probability was a substantial overestimate), a 5,000 milligram dose of lidocaine exceeded 60 milligrams per kilogram of bodyweight. Although other experts testified that some of the more aggressive surgeons might use "as much as 80 to 100" milligrams per kilogram, in Dr. Scarborough's opinion, 60 milligrams per kilogram was too much, and fell below the minimum standard of care. Dr. Klein now recommends a lidocaine dosage of 35 milligrams per kilogram, but this is not an absolute number. It is merely a guide. Furthermore, the proper lidocaine dosage was still being established during the period when Patient 1 saw Dr. Parks.
 {¶ 14} Dr. Parks treated Patient 2 in 2000, for a malignant melanoma (skin cancer) on the patient's neck. Dr. Parks performed a biopsy on July 13, 2000, and removed the remainder of the malignant lesion on August 3, 2000.
 {¶ 15} The medical board initially charged Dr. Parks with failing to remove a large enough portion of the malignant lesion, but later determined that "the evidence [did] not support a finding that Dr. Parks' surgery had been inadequate." (Board Report, at 46.) *Page 7 
The board did find fault, however, in Dr. Parks' method of documentation of the procedure he performed on Patient 2. "The evidence is clear that Dr. Parks did not perform or document any vital signs for Patient 2 at the time of surgery. However, persuasive evidence was presented that, in an office setting using only local anesthesia, with the patient fully conscious and communicating with the physician, the standard of care had not required him to do so." Id. at 46-47.
 {¶ 16} Dr. Parks first saw Patient 3 on September 5, 2000. The patient was male, 62 years old at that time, and sought treatment for multiple skin lesions behind his left ear. After the first evaluation, Dr. Parks believed that the lesions were probably related to seborrheic dermatitis, and, given that diagnosis, he prescribed a mild cortisone cream. Five months later, Dr. Parks performed a biopsy of that same area, which revealed "Bowen's disease with superficial squamous cell carcinoma." Id. at 47. Dr. Parks then referred Patient 3 to a Dr. Siegle for a procedure known as Mohs surgery, which was performed on March 13, 2001.
 {¶ 17} The medical board found that Dr. Parks should have followed-up with Patient 3 much sooner than five months, to determine whether the cortisone treatment was effective, or whether a new diagnosis was required. "The evidence supports a finding that the tumor behind Patient 3's ear that was excised on March 13, 2001, occupied or overlapped the area that Dr. Parks described on September 5, 2000, as possibly being seborrheic dermatitis." Id. The report does not include any mitigating evidence with respect to Dr. Parks' treatment of Patient 3. *Page 8 
 {¶ 18} The first assigned error challenges the board's finding that Dr. Parks failed to obtain Patient 1's informed consent, and failed to advise Patient 1 that a chin/neck-lift would have yielded more favorable results than the multiple liposuction procedures.
 {¶ 19} The facts, as found by the board, were as follows: Dr. Parks testified that he discussed the possible alternate treatment options with Patient 1. Patient 1 testified that he did not. The board also found that Patient 1's testimony lacked credibility. The medical board's expert witness, Dr. Scarborough, testified "convincingly," that Patient 1's primary cosmetic issue was not related to excess fat; rather, it was the result of loose, hanging skin resulting from her losing 40 pounds. The board noted that "liposuction can tighten the skin as well as remove fat" but, also, stated that a neck-lift might have produced better results. (Board Report, at 44.)
 {¶ 20} Dr. Parks' expert witnesses, Drs. Siegle and Lillis, testified that Dr. Parks' care did not fall below the minimum standard with regard to this issue. They also testified that they would have proceeded with the same liposuction procedure Dr. Parks used, but only after the patient had opted not to have a chin/neck-lift.
 {¶ 21} Although Dr. Parks documented his discussions with Patient 1 concerning the advisable chin/neck-lift and her refusal to elect the alternative procedure before one of the surgeries, the board found that there was no similar documentation for the other two. Whether this means that Dr. Parks failed to have this discussion with Patient 1, or whether he simply failed to document it, we cannot know. We must, however, defer to the board's finding in concluding the former.
 {¶ 22} Because the board ultimately found that Dr. Parks failed to obtain Patient 1's informed consent for two of the three procedures, there is evidence supporting the *Page 9 
board's order as it relates to that issue. Dr. Scarborough testified: "As physicians, we're very aware of the requirements for charting when we deal with insurance companies * * *. If something is not charted, it's assumed it is not done." (Board Report, 17.)
 {¶ 23} The first assignment of error is overruled.
 {¶ 24} The fourth assigned error is similar to the first, to the extent it relates to Patient 1. Here, Dr. Parks again challenges the board's finding that he failed to obtain Patient 1's informed consent but, also, challenges the board's finding that Dr. Parks made a critical error by failing to record Patient 1's weight before the April 26, 1996 liposuction procedure. We have already discussed the informed consent issue, we therefore overrule that part of the assigned error.
 {¶ 25} With regard to Dr. Parks' failure to document Patient 1's weight issue, Dr. Scarborough believed that Dr. Parks administered too much lidocaine to Patient 1, because Dr. Scarborough follows a more conservative surgical approach. On the other hand, Dr. Parks submitted evidence, including expert testimony, and scholarly articles written by Dr. Jeffrey Klein — the physician credited for being the father of the modern liposuction procedure — suggesting that although Dr. Parks' administration of lidocaine may have been on the progressive side of the scale, it was within an acceptable range nonetheless. However, the testimony of Dr. Scarborough could be found and was found by the trial court to constitute reliable, substantial and probative evidence. Based upon this testimony, the trial court determined: "Clearly documenting a patient's weight immediately [before] surgery is critical in calculating the total drug dosage given to that patient." (Decision and Entry, at 13.) We cannot overturn the board's decision on this issue without finding an abuse of discretion by the common pleas court, and we cannot *Page 10 
say that the trial court abused its discretion in its findings. We, therefore, overrule the remaining portions of the fourth assignment of error.
 {¶ 26} The second assigned error alleges that the board's decision to discipline Dr. Parks was based, at least in part, on the board's belief that Dr. Parks sees too many patients to provide each with adequate care. Dr. Parks testified that he typically sees 900 patients within any given month. Although the board did not specifically state that Dr. Parks' caseload constituted any of the basis for his discipline, individual members of the board were very critical of the fact that Dr. Parks saw this volume of patients on a regular basis. Board minutes demonstrate that board members Drs. Steinbergh and Kumar expressed reservations about the caseload. Dr. Kumar stated that, as far as he was concerned, Dr. Parks represented what is really wrong with some medical professionals. Dr. Robbins stated that he believed Dr. Parks was "overloaded," and "seeing way too many people," and also said that, "If Dr. Parks would cut his load in half, he would probably do a fairly fine job, by and large." (Board Minutes, at 16581.) Board member Dr. Buchan concurred with Dr. Robbins' statement. Dr. Parks asserted that those statements were unfair and unreasonable if for no other reason then because none of the board members practice in the same area as he.
 {¶ 27} Dr. Parks was not given an opportunity to respond to, or defend the allegations of some members of the board that he was overloaded, or seeing too many patients. However, there is no evidence that the board actually based its decision to discipline Dr. Parks on the statements about his caseload, as opposed to the medical errors found by the board. *Page 11 
 {¶ 28} There are no references to Dr. Parks' caseload in any part of the hearing examiner's report except on page 17, which states the fact that Dr. Parks testified that he sees 900 patients per month. There are no comments or conclusions in the report relating to this evidence. Thus, the caseload comments may be seen as an explanation for some board members as to why the medical errors occurred, but caseload issues did not constitute independent grounds for discipline.
 {¶ 29} The second assignment of error is overruled.
 {¶ 30} The third assigned error concerns the board's treatment of Dr. Scarborough's testimony, which Dr. Parks argues should have been excluded based on the witness's unavoidable conflict of interest.
 {¶ 31} Dr. Parks argued to the board, and to the trial court, that Dr. Scarborough's testimony should have been excluded or given little weight. However, the board hearing officer determined that whatever conflict of interest existed as to Dr. Scarborough had a minimal effect on Dr. Scarborough's credibility. (Report and Recommendation, at Finding of Fact, ¶ 2.)
 {¶ 32} Indeed, the medical board does have a policy requiring witnesses to disclose any potential conflict of interest, but as the trial court noted, the policy does not mandate exclusion of the testimony. Dr. Scarborough did disclose the conflict of interest in this instance, and at least one board member, Dr. Robbins, was "bothered by the fact that [Dr. Parks] previously worked for Dr. Scarborough," but the hearing examiner and the board ultimately concluded that the conflict of interest did not taint Dr. Scarborough's testimony. *Page 12 
 {¶ 33} In dealing with this issue, the trial court noted that the medical board members are physicians — i.e. experts — in their own right, which deemphasizes the need to exclude expert testimony which may come from a source with potential bias. However, courts handling administrative appeals are not in the best position to judge Dr. Scarborough's credibility or the credibility of an expert with an arguable bias. We do not hear or see the testimony generally, and this record does not demonstrate any obvious defect that would warrant a reversal. Again, it is not our role to substitute our judgment for that of the medical board.
 {¶ 34} Accordingly, we overrule the third assignment error.
 {¶ 35} The fifth assigned error concerns the board's findings relating to Patient 3. Dr. Parks claims that these findings exceed the scope of the charges filed in the citation letter the board issued to him on January 12, 2005. This citation letter is the administrative equivalent of an indictment, which puts the respondent on notice of the charges against him. Dr. Parks now argues that, by exceeding the charges in the citation letter, which is prohibited by R.C. 119.07, the board's order violates due process. We again are not in a position to overturn the medical board's finding of fact related to this issue, which would be a prerequisite to establishing Dr. Parks' due process argument.
 {¶ 36} Dr. Parks wrote in Patient 3's medical chart that he initially diagnosed the patient with seborrheic dermatitis behind the left ear. The board's citation letter referred to this area as the "left posterior auricular zone." Dr. Parks' own expert witness, Dr. Siegle, testified that, in his initial review of Patient 3's records, he was uncertain as to the specific location Dr. Parks was referring to when he wrote "back of," or "behind" the ear. (Tr. 557-559.) Dr. Siegle stated that, based on the record alone, and without any *Page 13 
clarification of the record from Dr. Parks, in his opinion, Dr. Parks' standard of care fell below the minimum. Dr. Siegle stated that he was only able to understand what Dr. Parks meant after consulting with him personally, and having Dr. Parks draw him a diagram of the area being treated.
 {¶ 37} Because we are not in a position to throw out the medical board's factual determination that Dr. Parks failed to document the area he initially treated on Patient 3's head, we must overrule the fifth assignment of error.
 {¶ 38} Having overruled all the assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
 BROWN and FRENCH, JJ., concur. *Page 1